# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STEVEN ERDELL GETER,**<br><br>                              **Petitioner,**<br><br>                    **vs.**<br><br>**BRUNO STOLC, Warden,**<br><br>                              **Respondent.** | Civil No.     12-cv-1178-DMS(JMA)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF HABEAS PETITION** |

Steven Erdell Geter ("Geter"), a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 ("Petition"), seeks relief from his January 27, 2009 conviction of corporal injury to his spouse, Ruth Adams, and residential burglary of an occupied dwelling in San Diego County Superior Court Case No. SCE275579. He is serving a thirteen year prison term. The California Court of Appeal affirmed the judgment in an unpublished opinion, and his petition for review was summarily denied by the California Supreme Court. His attempts at collateral relief in the state courts were unsuccessful at all three levels of habeas review. Geter filed his federal Petition on May 14, 2012. Respondent filed an Answer opposing any relief. (ECF No. 10.) Geter filed a Traverse. (ECF No. 12.) In consideration of the record and controlling legal authority, it is recommended that the Petition be **DENIED**.

\\

# I.    BACKGROUND

## A.    Factual Background

In its unpublished decision affirming the judgment, the California Court of Appeal summarized the facts from the record "simply to give context to his contentions on appeal." (Lodg. No. 7 (Cal. Ct. App. Case No. D055435 (Jul. 38, 2010), slip op.) Neither in state court nor here does Geter "contend the evidence to support his conviction was either inadmissible or insufficient." (Id., slip op. at 2.) On federal habeas review, a rebuttable presumption of correctness attaches to state appellate courts' factual statements. 28 U.S.C. §2254(e)(1); Moses v. Payne, 555 F.3d 742, 746, n.1 (9th Cir. 2009). Geter does not dispute the accuracy of the court's factual summary. Through the testimony of the victim and an investigating police officer, the prosecutor established:

> Geter and his wife, Ruth Adams, the victim in this case were married in 1995. Adams described the relationship as abusive. The couple separated in September 2007. Geter and Adams were in contact with each other a number of times in the three weeks following their separation in an effort to evaluate their on-going relationship.

> On October 26, 2007, Adams and Geter met at a bar near Geter's apartment. They spent over an hour in the bar drinking cocktails and discussed their relationship.

> Eventually, Adams and Geter went to Geter's apartment where they engaged in sexual relations. During that encounter Geter became angry and physically aggressive. Adams attempted to leave and Geter blocked the door. She finally managed to leave the apartment.

> A struggle ensued, during which Geter choked Adams and threw her to the ground. Adams broke free and fled toward the parking lot. Geter stopped Adams at the gate. Her hand was caught in the gate. She was able to get free and went to her car.

> Adams did not contact the police on October 26. She testified she felt foolish having had drinks and sex with Geter. She said she brought it on herself.

> During the next few days Geter repeatedly came to Adams's apartment. She would not let him in, which made Geter angry. On October 30, 2007, Geter called Adams multiple times and left messages. Geter also came to her residence multiple times that day. At one point Geter brought a man he called "Mouse" to the door. "Mouse" told Adams he was going to be watching her and threatened her that she would not be safe walking her dog.

> In his efforts to contact Adams on October 30, Geter climbed over her fence and attempted to enter through the back window. Geter was yelling and Adams was afraid. Adams called 911. Geter departed during the course of the 911 call. The tape of the 911 call was played for the jury.

> Geter's telephone calls continued on October 31, 2007. He made visits to the apartment were Adams lived and made further threats to her. Geter became angrier

that Adams would not let him in. Geter then pried open the kitchen window. Geter put his hands inside the apartment in an attempt to remove the window. Adams again called 911. The tape of the second 911 call was played for the jury. During that call Geter could be heard to say, "I will be back tonight."

El Cajon Police Officer Darren Ehlers contacted Adams after the 911 call. He interviewed her, inspected the damaged window and observed the injuries she reported receiving during her struggles with Geter on October 26.

Ehlers contacted Geter. Before any questioning Geter volunteered, "What injuries did she show you?" He also said, "Did she tell you I was trying to get into her house?" Geter also said, "Well, you know, she is probably going to tell you that she had these injuries, but its from rough sex." When asked about the reported incident on October 26, 2007, Geter initially said he never put any marks on Adams. He then changed his story and said the marks were from rough sex and that Adams had fallen down a set of stairs.

(Lodg. No. 7, slip op. at 2-4.)

Adams testified that Geter was violent throughout their eleven year marriage, she feared him, she had moved to an apartment, and she was attempting to leave him at the time of the charged crimes. (*See, e.g.*, Lodg. No. 1, RT vol. 4 at 175, 185, 193; id. RT vol. 5 at 351-352.) The only other prosecution witness was a domestic violence expert who had never met the parties nor read the police reports in this case. The expert provided general testimony about typical patterns of behavior and states of mind when domestic violence is part of a relationship. (Id., RT vol. 4 at 262-306.) Defense counsel unsuccessfully objected to allowing the expert to testify, but conducted a detailed cross-examination. The court also denied counsel's subsequent motion to strike the expert's testimony as speculative and irrelevant. (Id. at 280-282, 295-296.)

The defense witnesses were Geter himself and a recalled Ruth Adams.

Geter testified in his own behalf. He denied inflicting injuries on Adams. He explained injuries to her knees as having been caused when Adams had engaged in sex on the floor with some "guy" she had met in front of a liquor store.

Geter admitted he went to the apartment on October 31, 2007, to leave a gift for his nephew who was with Adams. Geter denied being angry or yelling. He denied making any threats or that he tried to enter the apartment. Geter also denied that the voice on the 911 tape was his.

(Lodg. No. 7, slip op. at 4.)

## B. **Procedural Background**

The charged crimes occurred on October 26, 2007 (corporal injury to spouse, a violation of Cal. Penal Code § 273.5(a)) and October 31, 2007 (first degree burglary of an inhabited dwelling, a

violation of Cal. Penal Code §§ 459, 460; Cal. Penal Code § 667.5(c)(21)). (Lodg. No 2, Clerk's Transcript ("CT") at 0002.) It was also alleged that Geter had a prior serious felony conviction and a strike prior. (Id. at 0002-0003.)

Geter was represented by appointed public defender Jane Kinsey at his January 10, 2008 preliminary examination proceedings (*see* Lodg. No. 12), the first of his six attorneys in this case. His Petition alleges all five of his subsequent attorneys provided him with ineffective assistance of counsel ("IAC"). At the preliminary hearing, the People called two witnesses: the victim, Ruth Marie (Adams) Geter, and the arresting police officer, Darren Ehlers. The defense called police officer Erik Duesler, who had met with Adams on September 14, 2007, a month before the charged incidents occurred, to investigate her report that her husband had roughed her up, although she did not want him arrested. Officer Duesler saw no obvious evidence of the injuries she claimed to have. He also interviewed Geter and found inconsistencies with Adams' statements. The incident resulted in no detention or arrest. (Lodg. No. 12 at 38-43.) The defense also called Shira Lewis, a bartender who had witnessed some of the interactions between Geter and Adams on October 26, 2007. Her testimony was inconsistent with Adams' representation that she drove away when she got to her car after managing to escape from Geter at the gate. Lewis stated she saw Adams sitting in her parked car with the headlights on for about 15 or 20 minutes. (Id. at 44-49.) Neither Duesler nor Lewis was called as a trial witness.

Retained attorney Gregory Turner represented Geter at a July 25, 2008 hearing of his motion to set aside the information pursuant to Cal. Penal Code § 995, on grounds that Geter's purportedly "de minimus" prying at Adam's window from the outside did not satisfy a required element for burglary. (Lodg. No. 1, RT vol. 2.) The court denied the motion. (Id. at 105.)

By the time of trial, retained attorney George Siddell was representing Geter. (*See* Lodg. 1, RT vol. 3.) Trial began the afternoon of January 21, 2009. (Lodg. No. 1, RT vols. 3-5.) Opening statements and the prosecutor's case in chief concluded Thursday, January 22, 2009. Court recessed until the following Monday, January 26, 2009. (Id., RT vol. 4 at 307.) All evidence had been presented by about 10:30 that Monday. (Id. RT vol. 5 at 356.) On January 27, 2009, after less than five hours of deliberation, the jury convicted Geter of both charged crimes. (Id., RT vols. 5, 6.)

12cv1178-DMS(JMA)

On March 13, 2009, before Geter was sentenced, the trial court heard Geter's <u>Marsden</u> motion to substitute new counsel in place of Mr. Siddell. (Lodg. No. 1, RT vol. 1; Lodg. No. 3, RT vol. 1A.)[1] The hearing was attended by both Mr. Siddell and Geter's first retained attorney, Mr. Turner. Mr. Siddell declared a conflict, because Geter had become "extremely unhappy with me and probably even more unhappy with Mr. Turner." (Lodg. No. 1, RT vol. 1 at 1.) Geter's primary complaint appears to have been that Mr. Siddell was "not prepared for trial," although Geter also represented that he didn't "blame" Mr. Siddell because he "had nothing to work with, . . . nothing to go on" because of the death shortly before trial of the investigator Mr. Turner had recommended Geter engage. (Lodg. No. 3, RT vol. 1A at 6-7.) Geter also acknowledged that trial preparations were impeded because of funding problems associated with a transition to a new contractual investigative service that made it difficult "to try to get the evidence and the witnesses and subpoenas that I needed that was vital to this case." (<u>Id.</u>) At the conclusion of the <u>Marsden</u> hearing, the court granted Geter's request to have Mr. Siddell relieved. (<u>Id.</u> at 15.) "The new counsel will be appointed for the purpose of evaluating the case to determine whether, in new counsel's opinion there might be grounds for a motion – to file a motion for new trial." (Lodg. No. 1, RT vol. 1 at 16.)

On June 12, 2009, the trial court heard the new trial motion brought by Geter's new attorney, Daniel Cohen. (Lodg. No. 1, RT vol. 7.) The gist of the motion appears to have been ineffective assistance of trial counsel for failure to call certain witnesses who could have impeached Adams' credibility, in particular the two witnesses who had testified for the defense at Geter's preliminary hearing, Officer Eric Duesler and bartender Shira Lewis. After considerable discussion on the record about possible tactical reasons trial counsel may have had for not calling those witnesses, including among other things the risks to Geter's case of doing so, the court denied the motion, finding that the verdict was not "contrary to law or evidence," that there was "certainly enough evidence to convict." (<u>Id.</u> at 455-56.)

With Mr. Cohen still representing him, Geter was sentenced on June 19, 2009 by the same judge who had presided at his trial. (Lodg. No. 1, RT vol. 8.) Geter had previously waived trial on

---

[1] The entirety of the 16-page March 13, 2009 <u>Marsden</u> hearing transcript is divided between Lodgment No. 1, RT vol. 1, and Lodgment No. 3, RT vol. 1A.

his serious felony prior and his strike prior, and admitted both. (Id., RT vol. 6 at 439-441.) Probation recommended a prison term of 19 years. (Id., RT Vol. 8 at 460.) Geter made a statement on his own behalf. (Id. at 463-464.) For reasons recited on the record, including the court's expressed surprise about the extent of Geter's prior criminal record revealed in the Probation Report, the court selected the Count 2 burglary as the principal crime. The court sentenced him to the 4-year mid term for that crime, doubled to eight years due to the strike prior which the court declined to strike, plus a concurrent mid-term sentence of three years, doubled, on the Count 1 spousal abuse conviction, to be served concurrently with the eight-year Count 2 sentence. (Id. at 467-468.) Geter received an additional five-year term "by virtue of a serious felony," added to the eight-year term on Count 2, for a total term of 13 years. (Id. at 468-469.)

Geter appealed his conviction on January 25, 2010, through appointed counsel, Harry Zimmerman. He alleged ineffective assistance of trial counsel for failing to call certain witnesses he claims would have impeached the victim's credibility and trial court abuse of discretion in denying Geter's new trial motion on ineffective assistance of counsel ("IAC") grounds despite observing "that there was no tactical basis for failing to call at least one of the witnesses who would have supported the defense case based on the victim's lack of credibility." (Lodg. No. 4, Opening Brief at ii.) The court of appeal affirmed the judgment on July 28, 2010 in a reasoned decision. (Lodg. No. 7 (Cal. Ct. App. Case No. D055435), unpublished slip. op.) In a September 9, 2010 Petition For Review To Exhaust State Remedies filed in the California Supreme Court, Geter alleged IAC of trial counsel in violation of his state and federal constitutional rights on grounds: "Trial counsel's failures . . . interfered with appellant's ability to present his defense, the key component of which was the victim and appellant's credibility"; and "[i]t was ineffective assistance of counsel when trial counsel did not know he had the responsibility to subpoena his own witnesses." (Lodg. No. 8, Petition For Review To Exhaust State Remedies, at ii.) The California Supreme Court summarily denied the petition on October 13, 2010, without citation to authority. (Lodg. No. 9 (Cal. Sup. Ct., Case No. S186181, Oct. 13, 2010).)

Geter indicates on the Petition form that he filed an unsuccessful petition for certiorari in the United States Supreme Court, without providing a date or a case number, raising the same five

grounds for relief as he presents here  (Pet. 3, ECF No. 1),[2] but there is no evidence in the record to support that representation.  He responded "N/A" to all the Petition form questions inquiring about collateral review at each state court level.  (<u>Id.</u> at 3-4.)  Despite the "N/A" response to the question whether he sought collateral review in the California Supreme Court, he adds as narrative: "I did file the same grounds in the California Supreme Court." (<u>Id.</u> at 4.)  His pro se habeas petition to the California Supreme Court, filed December 23, 2011, is provided as Lodgment No. 10, and Geter incorporates substantial portions of that filing verbatim into his federal Petition.

Respondent's Notice of Lodgment and Lodgments reflect no judicial activity between the summary denial of Geter's Petition for Review in the California Supreme Court on October 13, 2010 (Lodg. No. 9), and his December 23, 2011 habeas petition to the California Supreme Court  (Lodg. No. 10), well over one year later, where Geter presented the same claims as in his federal Petition and which the court summarily denied. (Lodg. No. 11, (Cal. Sup. Ct. Case No. S198963).)  Respondent's Answer correspondingly identifies as the only post-conviction activity in the state courts:  the court of appeal's July 28, 2010 order affirming the convictions; the September 4, 2010 petition for review in the California Supreme Court, summarily denied on October 13, 2010; and Geter's December 23, 2011 habeas petition to the California Supreme Court, summarily denied April 18, 2012, without citation to authority.  Geter filed his federal Petition on May 14, 2012.

Although the Answer summarily represents that Geter's federal Petition "appears timely" for AEDPA's one-year statute of limitations purposes (Ans. 2, ECF No. 10), Respondent's submitted record reveals a fourteen month unexplained gap between the conclusion of direct review and the commencement of state collateral review without any judicial activity.  If that record were complete and accurate, the July 28, 2010 decision affirming the judgment on direct review (Lodg. No. 7) would be the only reasoned state court decision addressing the merits of his claims.  Geter does not dispute the accuracy of Respondent's procedural history.  However, two exhibits to the Petition reveal that even Geter's own description of the procedural history of his case (based on his "N/A" responses on the Petition form and his failure to correct Respondent's account) is inaccurate.  (*See* Pet. 3-4, ECF

---

[2]  Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

No. 1.)  The actual procedural history of his case, as completed by the evidence of two state court decisions on collateral review intervening between the denial of his Petition For Review in the state supreme court and the filing of his habeas petition in the state supreme court, supports a finding that Geter's federal Petition is timely.

Geter attaches to his Petition two reasoned decisions from the state courts reaching the merits of his several IAC claims on collateral review, each denying him relief.  Petition Exhibit CC is an August 4, 2011 decision from the San Diego County Superior Court.  (ECF No. 1-1 at 149-153.) Petition Exhibit DD is a November 9, 2011 decision from the California Court of Appeal.  (ECF No. 1-1 at 164-165.)  Both those decisions intervene between the conclusion of direct review and the filing of his habeas petition in the California Supreme Court.  These were material omissions from the actual procedural history of his case not only for purposes of timeliness analysis, but also because federal habeas courts apply review standards to the last reasoned state court decision addressing the merits of the petitioner's federal claims.  *See* Campbell v. Rice, 408 F.3d 1166, 1170 (9th Cir. 2005).

Geter's federal Petition presents the same five grounds for relief as he raised on collateral review to the California Supreme Court.  Respondent concedes that the claims are exhausted.  (Ans. 2, ECF No. 10.)  Ground One alleges his first retained attorneys, Mr. Turner and Mr. Tiller, provided constitutionally ineffective assistance for failure to investigate the case.  Ground Two alleges trial counsel, Mr. Siddell, provided IAC in the same manner and also for failure to call certain defense witnesses to testify, among other things.  Ground Three alleges his post-conviction attorney, Mr. Cohen, was ineffective at the new trial motion hearing and at sentencing.  Ground Four alleges the trial court abused its discretion in refusing to continue the trial date by more than one day because Mr. Siddell was new to the case.  Ground Five alleges his appellate attorney, Mr. Zimmerman, was ineffective for failure to present the same arguments to the California Court of Appeal on direct review as he subsequently presented to the California Supreme Court in a petition for review and, liberally construing his Petition arguments, for failure to raise additional claims as Geter himself subsequently articulated them.

\\

\\

## II.     DISCUSSION

### A.     <u>Legal Standards For Federal Habeas Relief</u>

Habeas corpus is a " 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." <u>Harrington v. Richter</u>, 562 U.S. __, 131 S.Ct. 770, 786 (2011), *quoting* <u>Jackson v. Virginia</u>, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring). A federal court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Federal habeas courts may not "reexamine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 68 (1991); <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76, (2005) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus").

The Antiterrorism and Effective Death Penalty Act ("AEDPA") governs review of Geter's claims because he filed his federal habeas petition after that statute's 1996 effective date. <u>Lindh v. Murphy</u>, 521 U.S. 320, 322-23 (1997). AEDPA imposes a " 'highly deferential standard for evaluating state-court rulings,' " requiring "that state-court decisions be given the benefit of the doubt." <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24 (2002), *quoting* <u>Lindh</u>, 521 U.S. at 333 n.7. "AEDPA prevents defendants -- and federal courts -- from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." <u>Renico v. Lett</u>, 559 U.S. 766, 130 S.Ct. 1855, 1866 (2010). "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Richter</u>, 131 S.Ct. at 786-87.

"By its terms § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." <u>Richter</u>, 131 S.Ct. at 784. Federal habeas relief is available under the first exception if the state court result "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *see* <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73-76 (2003); *see*

9

*also* Williams v. Taylor, 529 U.S. 362, 405-06 (2000) (distinguishing the 28 U.S.C. § 2254(d)(1) "contrary to" test from its "unreasonable application" test). To be found an "unreasonable application" of the precedent, the state court decision must have been "more than incorrect or erroneous;" it "must have been 'objectively unreasonable.' " Wiggins v. Smith, 539 U.S. 510, 520-21 (2003) (citations omitted); Renico, 130 S.Ct. at 1866. A lack of holdings from the Supreme Court on the issue presented precludes relief under 28 U.S.C. § 2254(d)(1). Carey v. Musladin, 549 U.S. 70, 77 (2006); *see* Moses, 555 F.3d at 754 ("[W]hen a Supreme Court decision does not 'squarely address[]' the issue . . . it cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue," and a federal habeas court "must defer to the state court's decision"), *citing, inter alia,* Wright v. Van Patten, 552 U.S. 120, 123 (2008). Section "2254(d) mandates that only Supreme Court precedential holdings clearly establish a right, [but] our circuit precedent may provide persuasive authority for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent." Mendez v. Knowles, 556 F.3d 757, 767 (9th Cir. 2009).

Under the second AEDPA exception, relief is available only if the state court based its result "on an unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); Miller-El v. Cockrell, 537 U.S. 322, 340 (2003) ("Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding, § 2254(d)(2)"). The question "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable -- a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

Federal courts apply AEDPA standards to the "last reasoned decision" by a state court. Campbell, 408 F.3d at 1170); *see* Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding the judgment or rejecting the same claim [are presumed to] rest upon the same ground"). Federal habeas courts reviewing prisoners' claims under 28 U.S.C. § 2254 "must assess the prejudicial impact of constitutional error in a state court criminal trial under the 'substantial and injurious effect' standard

set forth in" <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). <u>Fry v. Pliler</u>, 551 U.S. 112, 121 (2007); *see* <u>Baines v. Cambra</u>, 204 F.3d 964, 977 (9th Cir. 2000) (the Ninth Circuit applies the <u>Brecht</u> harmless error standard "uniformly in all federal habeas cases under § 2254"). Thus, even if constitutional error occurred, the petitioner must still demonstrate prejudice, that is, that the error "had substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht</u>, 507 U.S. at 637-38 (internal punctuation and citation omitted).

**B.    No Evidentiary Hearing Warranted**

In his prayer for relief, Geter asks the Court to "order evidentiary hearings." (Pet. 111, ECF No. 1.) He argues that Mr. Siddell's August 12, 2010 response declining, in response to a letter from appellate counsel Mr. Zimmerman, to discuss his "trial tactics and investigation," warrants an evidentiary hearing:

> The questions Sidell decline[d] to answer in Zimmerman's letter are the one[s] trial court and Daniel Cohen failed to discuss. Daniel failing to subpoena Sidell and witnesses left room for speculation. That's why Petitioner request for [sic] a evidentiary hearing.

(Pet. 10, ECF No. 1; *see also* Traverse 10, ECF No. 12: "Petitioner move[s] this court for an evidentiary hearing should the court find it necessary.")

Respondent argues: "Geter's failure to provide evidence in support of his state habeas corpus petition means that he cannot overcome any state-court fact finding and similarly cannot receive a federal evidentiary hearing. *See Cullen v. Pinholster*, 131 S.Ct. 1388, 1398; 28 U.S.C. § 2254(d), (e)." (Ans. 3, ECF No. 10 (parallel citation omitted).) Actually, four of Geter's attorneys and others provided declarations as part of the evidentiary record expressly considered by both the superior court and the court of appeal. He provides those declarations as exhibits to the Petition: from attorney Turner, dated September 23, 2010 (Pet. Exh. L, ECF No. 1 at 163-164 (duplicate copy at Pet. Exh. W, ECF No. 1-1 at 16-17)); from attorney Kinsey, dated January 27, 2010 (Pet. Exh. U, ECF No. 1-1 at 9-11); from officer Duesler, dated October 2, 2010 (Pet. Exh. V, ECF No. 1-1 at 13-14); from attorney Tiller, dated September 27, 2010 (Pet. Exh. X, ECF No. 1-1 at 19-20); and from appellate attorney Zimmerman, dated December 13, 2010 (Pet. Exh. Y, ECF No. 1-1 at 22-23). Geter also provides Mr. Siddell's August 12, 2010 letter response to Mr. Zimmerman's request that he explain

his trial strategy and evidentiary decisions. (Pet. Exh. GG, ECF No. 1-1 at 178.) Although Mr. Siddell declined to provide any detailed explanation regarding his trial strategy and evidentiary choices, he demonstrated that those decisions were considered ones.[3] (Id.)

AEDPA prescribes the manner in which federal habeas courts must approach the factual record and "substantially restricts the district court's discretion to grant an evidentiary hearing." Baja v. Ducharme, 187 F.3d 1075, 1077 (9th Cir. 1999). "[A] determination of a factual issue made by a State court shall be presumed to be correct," with the petitioner having "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Section 2254(e)(2) limits "the discretion of federal habeas courts to take new evidence in an evidentiary hearing." Cullen v. Pinholster, __ U.S. __, 131 S.Ct 1388, 1400-01 (2011). "If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim" unless the applicant shows that the claim relies on a new rule of constitutional law "made retroactive on collateral review by the Supreme Court, that was previously unavailable," or "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A). In addition, the petitioner must demonstrate that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2)(B). Geter does not satisfy those criteria.

Moreover, "[b]ecause a federal court may not independently review the merits of a state court decision without first applying the AEDPA standards, a federal court may not grant an evidentiary hearing without first determining whether the state court's decision was an unreasonable determination of the facts." Earp v. Ornoski, 431 F.3d 1158, 1166-67 (9th Cir. 2005), citing Lockyer, 538 U.S. at 71; see Schriro, 550 U.S. at 474 ("Because the deferential standards prescribed by § 2254 control

---

[3] Mr. Siddell states in the letter that he "decline[s] to answer each and every question you set forth or to make a declaration," noting among other things that "Mr. Geter approved my trial tactics and investigation and only became unhappy when the jury found him guilty." (Pet. Exh. GG, ECF No. 1-1 at 178.) He further noted that Geter had rejected a plea deal he had recommended Geter accept, preferring to go to trial, and that the jurors told him after the trial that they found Geter not to be a credible witness and the 911 tape seemed to support Adams' testimony. "As to why certain witnesses were not called and documents not produced, relevancy and the [n]otion that some doors are better left unopened were considerations," because "Mr. Geter had a considerable history of violence which would have come into the trial that was [left] out." (Id. (emphasis in original).)

whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate"). "In practical effect, . . . this means that when the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.' " Cullen, 131 S.Ct. at 1401, 1399 (citation omitted).

"If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court." Cullen, 131 S.Ct. at 1400, 1398-99 ("State court decisions are measured against this Court's precedents as of 'the time the state court renders its decisions' "), quoting Lockyer v. Andrade, 538 U.S. 63, 71-71 (2003). "[R]eview under § 2254(d)(1) focuses on what a state court knew and did." Id. at 1399. If a claim subject to 28 U.S.C. § 2254(d)(1) does not satisfy that statutory requirement, it is "unnecessary to reach the question whether § 2254(e)(2) would permit a [federal] hearing on th[at] claim." Id. at 1400 (citation omitted). For the reasons discussed below, the Court recommends a finding that none of Geter's claims satisfies the statutory requirement of 28 U.S.C. § 2254(d)(1). By its express terms, 28 U.S.C. § 2254(d)(2) restricts federal habeas review to the record that was before the state court. Review here is accordingly limited to determining whether the state court reasonably applied controlling United States Supreme Court authority in resolving Geter's claims and made objectively reasonable factual determinations from the record before that court. 28 U.S.C. §2254(d). The undersigned recommends that the Court find Geter does not satisfy the exacting requirements of 28 U.S.C. §2254(e), and that an evidentiary hearing is neither warranted nor permissible under the AEDPA restrictions. His request should be **DENIED**.

## C. None Of Geter's Claims Warrants Relief

### 1. Legal Standards Controlling Ineffective Assistance Of Counsel Claims

A defendant claiming IAC must show both (1) deficient performance under an objective standard of reasonableness and (2) prejudice. Strickland v. Washington, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, "[t]he challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' " Richter, 131 S.Ct. at 787, quoting Strickland, 466 U.S. at 687. To demonstrate prejudice, the petitioner must show that "but for counsel's unprofessional errors," there is a reasonable

probability "the result of the proceeding would have been different." Strickland, 466 U.S. at 690, 694 ("A reasonable probability is a probability sufficient to undermine confidence in the outcome"); *see* Richter, 131 S.Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable"). "Because failure to meet either [Strickland] prong is fatal to [an IAC] claim, there is no requirement that we 'address both components of the inquiry if the defendant makes an insufficient showing on one.' " Gonzalez v. Wong, 667 F.3d 965, 987 (9th Cir. 2011), *quoting* Strickland, 466 U.S. at 697; *see* Bell v. Cone, 535 U.S. 685, 695 (2002) ("Without proof of both deficient performance and prejudice to the defense . . . the sentence or conviction should stand") (citation omitted).

Reviewing courts must apply a "strong presumption" that "counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689; *see* Cullen, 131 S.Ct. at 1400-01 (courts must give "attorneys the benefit of the doubt" for proceeding as they did).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Strickland, 466 U.S. at 690-91; *see* Premo v. Moore, __ U.S. __, 131 S.Ct. 733, 745 (2011) ("[H]indsight cannot suffice for relief when counsel's choices were reasonable and legitimate based on predictions of how the trial would proceed"), *citing* Richter, 131 S.Ct. 770.

"[I]t is not enough to convince a federal habeas court that, in its independent judgment, the state court decision applied Strickland incorrectly." Ortiz-Sandoval v. Clarke, 323 F.3d 1165, 1172 (9th Cir. 2003), *quoting* Bell, 535 U.S. at 699. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Richter, 131 S.Ct. at 786. The issue under AEDPA is whether the state court's application of the Strickland standard was unreasonable, not just whether defense counsel's performance fell below an objective standard of reasonableness. Richter, 131 S.Ct. at 788, 785 ( Federal habeas courts must ask "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard," not "whether counsel's actions were unreasonable").

\\

## 2.    <u>Summary Of Geter's Legal Representation</u>

As succinctly summarized by the California Court of Appeal in affirming Geter's conviction:

> Geter had multiple defense attorneys during his case. His first attorney was a deputy public defender who called a number of defense witnesses at the preliminary hearing. After that attorney was relieved, a series of retained counsel followed. The trial attorney for Geter was George Siddell. After Geter was convicted he made a motion to relieve Siddell in order to explore the question of whether Siddell was ineffective at trial. The trial court granted Geter's request and appointed another attorney [Daniel Cohen] to address the issue.

(Lodg. No. 7, slip op. at 4-5.) Geter's Opening Brief on appeal provides additional detail:

> Five attorneys in all represented appellant at the trial court level. Public Defender Jane Kinsey represented appellant for approximately four months after the complaint was initially filed on November 2, 2007. She handled the preliminary examination on January 10, 2008; after appellant was held to answer, she filed a section 995 motion on March 2, 2008 challenging the sufficiency of the evidence supporting the entry requirement and intent elements for the residential burglary count. (CT 184, 5.) The prosecution's opposition was served on Gregory J. Turner, appellant's newly-retained attorney number two, on March 20, 2008. (CT 22.)
>
> On June 18, 2008, Turner filed a supplemental section 995 motion, emphasizing the lack of entry evidence to support the burglary charge. (CT 26.) The motion was denied July 25, 2008. (CT 188.) By October 14, 2008, Turner had been relieved and the matter turned over to appellant's third attorney, the inexperienced Turner associate Ahren Tiller. (1A RT 7.) The record indicates that fourth attorney, George Siddell, appeared first on January 20, 2009, the day set for trial. He secured a one-day continuance before going to trial. (1A RT 14; CT 190.)
>
> Following trial but before sentencing, appellant's *People v. Marsden, supra*, request resulted in the appointment of Daniel Cohen, attorney number five. Cohen was appointed to determine if there were grounds for a motion for new trial. (1 RT 16.) . . . . The trial court denied Cohen's motion for a new trial asserting ineffective assistance of counsel. (CT 139; 7 RT 443, 455-456.)

(Lodg. No. 4, Opening Brief at 12-13.)

Geter alleges each of his attorneys, with the exception of the public defender who initially represented him, provided constitutionally ineffective assistance which caused his conviction.

## 3.    <u>Post-Conviction State Judicial Proceedings</u>

On direct review of trial counsel's performance, the appellate court observed: "In order to meet the burden of proving IAC the defendant must establish from the record that there was no rational tactical reason for trial counsel's decisions." (Lodg. No. 7, slip op. at 6 (citations omitted).) Observing that "it is often difficult from a trial record to discern why defense counsel failed to do

\\

15

something that the defendant later alleges to be an error," the court noted the record in Geter's case

was "somewhat expanded because a new trial motion was brought on IAC grounds."  (Id.)

> The motion did reference witness testimony from the preliminary hearing, but utterly neglected to address trial counsel's reasons for proceeding in the manner he did at trial. [¶] We share the trial court's frustration in reviewing this record to attempt to assess the validity of Geter's claim.  We know defense counsel did not call the bartender and personal friend of Geter to testify about her observations on October 26, 2007.  We also know defense counsel did not call a deputy sheriff to testify about an unrelated incident wherein Adams reported being injured by Geter, but declined to seek his arrest.  What we do not know, and cannot ascertain from this record, is why counsel did not call these witnesses.

(Lodg. No. 7, slip op. at 6-7.)

In nevertheless affirming the judgment, and irrespective of whether trial counsel erred, the

appellate court determined Geter did not establish prejudice, defeating an IAC claim:

> The trial court observed [before denying a new trial], and the record reflects, that defense counsel vigorously attacked Adams's credibility.  The entire theme of the defense was that Adams was not credible.  Counsel adduced evidence that Adams called Geter no less than six times after his arrest in this case, a fact the trial judge noted was far more impeaching than anything that might possibly flow from the witnesses Geter now claims should have been called.  In short, the trial court found the potential impeachment value of the witnesses at issue was not such that the court could conclude that trial counsel was somehow deficient.  The court also concluded that if for some reason one concluded trial counsel did make a mistake, there is no reasonable probability on this record that a more favorable result would have been obtained by Geter.  Our review of the record fully supports the trial court's analysis.

(Lodg. No. 7, slip op. at 7.)

The superior court and the court of appeal subsequently addressed and rejected Geter's IAC

claims against attorneys Turner, Tiller, Siddell, Cohen, and Zimmerman on habeas review, applying

the Strickland standards.  On August 4, 2011, the San Diego County Superior Court concluded from

the record that he did not receive unconstitutionally ineffective assistance of counsel, finding:

"Petitioner has failed to make a prima facie showing that his trial counsel committed 'error of

constitutional magnitude that led to a trial that was so fundamentally unfair that absent the error no

reasonable judge or jury would have convicted the petitioner.' "  (Pet. Exh. CC, ECF No. 1-1 at 152)

(citation omitted).)

> This court has also reviewed all the arguments set forth by the Petitioner in his habeas corpus petition regarding the representation he received prior to and during trial, during his motion for new trial, and on appeal.  Petitioner again contends that he was provided ineffective assistance of counsel due to the fact witnesses who could have provided potential impeachment testimony against the victim were not called to

testify by Mr. Siddell and that counsel did not have the case fully investigated or present all available evidence. Petitioner also contends that the other attorneys who handled his case did not fully present these arguments during the post-trial proceedings, specifically the motion for new trial and the appeal.

. . . .

In reviewing the record of the case, the evidence presented against Petitioner, and the findings of the trial court and appellate court, this court finds that the evidence of Petitioner's guilt was strong. In addition, even though there may have been additional testimony that could have impeached the victim's credibility, defense counsel did effectively impeach the victim's credibility at trial through his cross-examination. Further, Petitioner's claims of what a further investigation may have established are speculative. As such, this court finds that there is no reasonable probability that the result would have been different. (See *People v. Vines* (2011) 51 Cal.4th 830, 875-876[]) [applying the standards from *Strickland*, 466 U.S. at 693-694].

(Pet Exh. CC, ECF No. 1-1 at 151-152.)

On November 9, 2011, the California Court of Appeal denied Geter's subsequent habeas petition, noting that he had "based his motion for a new trial on a claim of ineffective assistance of counsel and the claim was also raised and rejected on appeal." (Pet. Exh. DD, ECF No. 1-1 at 164.) The court expressly considered evidence Geter provided there (which is also presented here) in support of his IAC claims, concluding: the "declarations of retained counsel J. Gregory Turner, Public Defender Jane Kinsey, Police Officer Eric Duesler, retained counsel Ahren A. Tiller, appointed appellate counsel Harry Zimmerman and friend Jeannett H. Barrick . . . . do not make a prima facie showing counsel was deficient and that Geter was prejudiced as a result." (Id., ECF 1-1 at 164-165.) That decision is the last reasoned state court opinion addressing the merits of Geter's federal claims, although this Court may "look through" to the reasoning of the lower state court addressing the same issue where the higher court does not elaborate its reasoning for a particular conclusion. *See* Ylst, 501 U.S. at 803.

The question on federal habeas review of IAC claims is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard," not "whether counsel's actions were unreasonable." Richter, 131 S.Ct. at 788, 785. For the reasons discussed below, the undersigned recommends that the Court find the state courts' uniform conclusions at all stages of review on the adequacy of Geter's legal representation and his failure to demonstrate prejudice from the conduct of any of his several attorneys were reasonable, and that the result not be disturbed.

## 4.    Ground One:  Turner Law Group Representation

Geter accuses retained counsel Gregory Turner and Ahren Tiller of constitutionally ineffective assistance and "professional misconduct" for allegedly failing to investigate his case and failing to "prepare for a legal defense," citing Strickland, 466 U.S. 668.  (Pet. 6, ECF No. 1.)  He attributes Mr. Siddell's purported lack of preparedness for trial to them:  "The fact that Sidell had nothing to go on due to Turner and Tiller's prior inadequate representation and lack of preparation trickled down to ineffective assistance of counsel."  (Pet. 9, ECF No. 1.)  In support of those allegations, Geter relies on the Turner Declaration, dated September 23, 2010, considered by the state courts on collateral review and  provided as Exhibit W to the Petition.  (Pet. 6-7, ECF No. 1.)

> 1)      I was Steven Geter's retained trial counsel from March 5, 2008 and made my last appearance on his behalf July 25, 2008.  The trial court relieved me from further representation after a conflict arose when Mr. Geter failed to comply with his retainer agreement.  Attorney Ahren Tiller replaced me as trial counsel in this matter.[4]

> 2)      Because I was relieved, I neither interviewed any witnesses nor prepared the case for trial.  However, based on the information available to me at that time, the case appeared to me to turn on the credibility of the alleged victim, Mr. Geter's ex-wife Ruth Geter.

> 3)      Before being relieved as trial counsel, I reviewed the investigative reports prepared by the Public Defender and the police report prepared by the San Diego County Sheriff's Officer E. Duesler of an incident occurring September 14, 2007 between Mr. Geter and his ex-wife Ruth.  I also reviewed the January 10, 2008 preliminary hearing transcript.  Consistent with his police report, Officer Duesler had testified that he saw no signs of the injuries Ruth Geter claimed Mr. Geter had inflicted.  Based on the inconsistencies in her statements and the lack of injuries, Officer Duesler determined not to pursue this matter.

> 4)      The Public Defender investigator had also interviewed Shira Lewis, who also testified at the preliminary hearing.  Contrary to Ms. Geter's contention that she had basically fled for her life on the night of October 26, 2007, Ms. Lewis had seen Ms. Geter sitting in her car for a while [*sic*] before leaving the area that night.  Because this case turned on the alleged victim's credibility, I saw no tactical reason not to call Lewis or Duesler.  Any potentially exculpatory witness should have been called.

(Pet. Exh. W, ECF No. 1-1 at 16-17; *see* Lodg. No. 2, CT at 189, 190.)

Geter alleges that "Turner and Tiller from the date of 3-5-2008 to 12-31-2008 failed to generate nor prepare any material relevant to the case prior to trial date of Jan. 20, 2009."  (Pet. 7, ECF No. 1: "from March 5, 2008 to Dec. 31, 2008 no investigative efforts, no subpoenas, no witnesses and

---

[4]  Although Mr. Tiller may have assumed primary responsibility for the defense earlier, it appears that Mr. Turner was not formally relieved as counsel of record until October 14, 2008.  (*See* Pet. 32, ECF No. 1; *see* CT at 190: "Mr. Turner relieved - Ahren Tiller retained".)

no preparation was conducted with a remainder of 20 days to trial date for a case that the prosecution was able to prepare for 1 ½ years.") However, Mr. Turner declared that in addition to reviewing and assessing the case from the public defender's records and the preliminary hearing transcript, he had recommended a private investigator to Geter, whom Geter separately engaged to gather evidence and contact witnesses to support the preparation of his defense:

> 5) Mr. Geter independently paid Ross Crespi, a private investigator I recommended, to undertake investigation. Mr. Crespi passed away just prior to Mr. Geter's original trial date, and I never saw the fruits of his labor. I am aware that Mr. Tiller secured a confidential order for ancillary funds in order to conduct a new investigation of key witnesses and to serve subpoenas, but do not know if any further investigation took place. Because Mr. Crispi's death made his investigative reports unavailable, there was no tactical reason not to redo the investigation after the trial court ordered the funds for the investigation.

(Pet. Exh. W, ECF No. 1-1 at 17.)

Consistently with Mr. Turner's understanding that the court made funds available, Geter states: "On December 16, 2008, Tiller filed a declaration with the trial court asking for ancillary funds for a new investigation to interview key witnesses and re-serve subpoenas. The funds were granted on Dec. 31, 2008, 20 days prior to trial date of Jan. 20, 2009." (Pet. 7, ECF No. 1: "It was a violation of petitioner['s] right to effective assistance of counsel under the 6th Amendment when Turner, Tiller and Trial Counsel all failed to investigate using the court ordered ancillary funds.")

Geter also argues: "Clearly not to obtain deceased investigator's previous investigative efforts was ineffective assistance of counsel and prejudicial to petitioner's case." (Pet. 7, ECF No. 1.) However, he does not contest that he personally engaged Mr. Crespi's services and could on that basis presumably have procured for himself whatever work product may have existed from that investigation. He fails to refute Mr. Turner's representation that the investigator's death resulted in the unavailability of that work product, although a potential defense witness, Jeanette Barrick, provided Geter with a declaration dated April 8th, 2011, stating Mr. Crespi had subpoenaed her at some unspecified time to appear as a witness at Geter's trial, she spoke with him "regularly during 2008," representing that he "had a large file marked 'Geter Case' " and that he told her "he had interviewed a number of people" who would support Geter's innocence claim as well as information that Adams "was known for making up stories and lying to police." (Pet. Exh. T, ECF No. 1-1 at 5-7.)

Geter also argues his attorneys should have obtained phone records. According to Mr. Turner:

> 6)      My recollection was that Mr. Geter also requested that we obtain his telephone records on and between the dates covered by the charges, October 26 through October 31, 2007.  I do not have a specific recollection of the purpose of these records beyond their showing that the alleged victim was calling Mr. Geter.  Naturally, this would offset any claim of fear by the victim.  There was no tactical reason not to secure these records.

(Pet. Exh. W, ECF No. 1-1 at 17.)

As discussed below in connection with Ground Two, demonstrative evidence was not necessary for that purpose, defeating any prejudice attributable to the absence of that evidence. Adams admitted at trial that she called Geter several times after his arrest on the charges in this case. The phone records themselves thus would have had added nothing substantive to the trial evidence.

Moreover, as Geter acknowledges, the public defender had already amassed the material evidence in the course of her investigation in advance of the preliminary hearing. Mr. Turner declares he examined all those materials as well as the preliminary hearing transcript while preparing Geter's defense before being relieved as counsel, all of which would have been equally available to Mr. Tiller, the associate in his practice who assumed Geter's representation. The Turner Law Group knew Mr. Crespi had undertaken an investigation on Geter's behalf for defense preparation purposes.  Counsel had early concluded the case would turn on the jury's assessment of the respective credibility of Geter and Adams.  In these circumstances, in consideration of the developed record  and "applying a heavy measure of deference to counsel's judgments," the Turner Group attorneys' decision not to pursue further investigation was not an objectively unreasonable decision. Strickland, 466 U.S. at 690-91.

More fundamentally, even if Mr. Turner or Mr. Tiller provided deficient pre-trial representation, they had been relieved as counsel before trial.  Geter cannot in these circumstances satisfy either the deficient performance or the prejudice prong of a successful IAC claim against them based on the conduct or outcome of the trial.  The undersigned recommends a finding that any deficiencies in the Turner Law Group's pre-trial representation cannot be deemed a "but for" cause of Geter's conviction. Strickland, 466 U.S. at 697; Bell, 535 U.S. at 695.  Those attorneys facilitated the engagement of an investigator and secured funding from the court should trial counsel deem investigation beyond the existing record necessary.  Although Geter contends it was "a violation of

petitioner['s] right to effective assistance of counsel under the 6th Amendment when Turner, Tiller and Trial Counsel all failed to investigate using the court ordered ancillary funds" (Pet. 7, ECF No. 1), any prejudice from failure to further investigate is tempered by the nature of the case. The crucial evidence at trial was the testimony of the victim and the defendant. The jury was charged with assessing their credibility in consideration of the strength of the prosecution evidence, dwarfing any marginal impeachment value of the redundant or tangential evidence Geter argues defense counsel ought to have presented, as is more fully addressed below in the discussion of Mr. Siddell's trial representation.

For all the foregoing reasons, the undersigned recommends the Court find that the state courts reached an objectively reasonable result in concluding the Turner Law Group did not provide Geter with constitutionally ineffective assistance of counsel under the <u>Strickland</u> standards. Pursuant to the requisite "double deference" owed to state court results on IAC claims, <u>Richter</u>, 131 S.Ct. at 785, the undersigned recommends that relief on Ground One be **<u>DENIED</u>**.

### 5.      <u>Ground Two:  Siddell Substitution, Preparation, And Trial Performance</u>

Geter attaches to his federal Petition scores of pages of narrative from his unsuccessful state habeas petition to the California Supreme Court (Lodg, No. 10, pp. v-x, 1-90), purporting to demonstrate how his attorneys ought to have conducted their investigations and prepared and presented his defense. Prominent among his suggestions are areas of inquiry that would unavoidably have entailed a mini-trial on the emotional stability of his ex-wife involving multiple witnesses and mental health experts who Geter believes should have been engaged to test her for certain psychological syndromes. Even assuming results conforming to his predictions, they would have produced no exculpatory evidence with respect to the particular charged crimes. Similarly, he vaguely argues that evidence of certain unrelated incidents involving Adams would have further undermined her credibility by purportedly demonstrating to the jury that "the great majority of the claimed evidence [against him] was non-existent, fabricated, and fantasized" and perjured, whereas purportedly "we have actual innocence" in this case. (Pet. 24, ECF No. 1, *see* Pet. 57-100, ECF No. 1.) Geter infers that

Mr. Siddell provided  ineffective assistance in failing to pursue such a trial strategy, and that his

1  failure

2   to adopt that approach resulted in Geter's conviction.[5]

3       As a particular instance of purported IAC, Geter cites Mr. Siddell's failure "to ask for sufficient

4  time to prepare a case which he received the day of trial." (Pet. 8, ECF No. 1.) Contrary to Geter's

5  characterization, Mr. Siddell represented at a <u>Marsden</u> hearing in early March 2009 that Mr. Turner

6  "and I have been associated on the case for some time. . . ." (Lodg. No. 1, RT vol. 1 at 1.) He also

7  described for the court his association with the case:

8       MR. SIDDELL: I don't remember the exact date, but I probably was brought in about
        three weeks before the actual trial and I met with Mr. Geter probably a half dozen
9       times and probably spent a total of some 18 hours counseling with him . . . before the
        trial.

10
11 (Lodg. No. 3, RT vol. 1A at 13.)

12      Geter acknowledges that he met with Mr. Siddell through Mr. Turner about three weeks before

13 his January 20, 2009 trial. (Pet. 8, ECF No. 1.) He represents:

14      . . . Tiller's employment with Turner Law Group is abruptly terminated on Jan. 20,
        2009, the day of the trial he is no longer attorney of record. However, J.G. Turner, the
        shadow supervising attorney steps in and hands the case over to who he refers to as an
15      attorney with "extraordinary experience".

16      Trial Counsel, (George Sidell [sic], . . .) meets with petitioner three weeks prior
        to trial and then goes on vacation for two weeks. He returns from his vacation just one
17      day before trial date Jan. 20, 2009 and becomes attorney of record.

18      On Jan. 20, 2009, "the day before trial was to commence, Sidell requested for
        [sic] a 'one day continuance', stating to the court 'I am prepared', but need to obtain
19      phone records. Sidell utilized the next day by walking with petitioner to AT&T and
        ask for record of Ruth Adams (alleged victim). Where the counter person
20      incredulously told Sidell to get a subpoena. Sidell failed to obtain the subpoena which
        was ineffective assistance of counsel under Strickland Standard.

21  _____

22      [5]  The Court notes that Mr. Siddell actually pursued certain of Geter's supposed evidentiary leads
    intended to discredit Adams as part of his pre-trial case preparation. At the post-trial <u>Marsden</u> hearing, he told
23  the court: "Mr. Geter told me that he wanted me to investigate a woman who was going to come in and who
    was going to testify that his ex-wive was a notorious liar, that nobody believed her in the community, and that
    her reputation for truth, honesty, and veracity was awful. I contacted her. I subpoenaed her. I spoke with her
24  at length and she told me she was going to say quite the opposite if I brought her in." (Lodg. No. 3, RT vol 1A
    at 11.) He added: "And Mr. Geter asked me to do a number of things, and he and I, on the one day continuance
25  that we had, we went out, we talked to people, investigated situations." (<u>Id.</u>) Mr. Siddell determined, for
    example, that the property manager of Adams' apartment where the burglary occurred "had nothing of
26  evidentiary value" to add to the defense. (<u>Id.</u> at 11-12.) In addition: "Having to do with the officers, we were
    able to sanitize the defendant's criminal convictions . . . . And had I brought in the other officers that Mr. Geter
27  talks about, they had things to say about other incidents, on other dates . . . [b]ut had I done that, I would have
    opened up the door for a lot of other bad conduct to come in that I simply told Mr. Geter it was not to his
28  benefit" (<u>Id.</u> at 12.)

12cv1178-DMS(JMA)

(Pet. 8, ECF No. 1 (citations omitted).)

Counsel's conduct of the defense at trial demonstrated he was fully prepared to impeach Adams through her own testimony and was familiar with the investigation previously conducted by Geter's public defender, including the preliminary hearing record. Geter exaggerates the effect of Mr. Siddell's failure to present Adams' telephone records as trial evidence. They were unnecessary to establish that Adams placed calls to Geter after the charged crimes occurred. Mr. Siddell elicited Adams' admission that she had done so, for whatever impeachment value the jury may have attached to that fact.

Q    Since moving away out of California, did you ever contact the defendant again?

A    Yes.

Q    When was that?

A    Last year, probably in January.

Q    January of '08?

A    Yes.

Q    And how many times did you personally contact him?

A    A few times. I don't remember for sure.

Q    And were they in the span of the months [sic]?

A    Yes.

Q    And why did you call him if you had already moved out and you wanted to move on with your life, why contact him?

A    I can't say for sure. I was angry. I wanted him to explain why I had to file for bankruptcy and divorce. And how come I had to lose everything when I didn't do anything wrong. And I wanted to express my anger and hear what he had to say about it, I guess.

Q    Any of those phone calls that you made, were they wanting to get back together with him?

A    No, not at all.

(Lodg. No. 1, RT vol. 4 at 194-195.)

Adams admitted she had not told the prosecutor about those telephone calls until the week before trial. (Lodg. No. 1, RT vol. 4 at 195.) She testified she may have called Geter as many as six

times from her cell phone during that period (id. at 220), and that on some of those occasions she had been drinking (id. at 195). Defense counsel exploited that admission to create an inference potentially undermining her credibility regarding the events of October 26, 2007, when she and Geter drank apple martinis together. (Id. at 196.)

> Q    Well, when you have been drunk or when you drink alcohol, such as apple martinis, does it affect your ability to recall things?
>
> A    I suppose it could.

(Lodg. No. 1, RT vol. 4 at 195-196.)

In addition to alcohol consumption, defense counsel elicited testimony from Adams that could further suggest the accuracy of her recollections might be unreliable or impaired. She admitted that while they were in his apartment on October 26th, she and Geter discussed some marijuana he had which she wanted, but he would not give it to her. She admitted she had not "told the prosecution about the weed component of October 26th 2007." (Lodg. No. 1, RT vol. 4 at 223-224.) Such information likely could have come only from Geter himself, supporting Mr. Siddell's representations to the court that he spent several hours conferring with Geter before trial.

In addition, there appears to be no foundation for Geter's bald conjecture that defense counsel "fail[ed] to review the preliminary examination transcripts" (Pet. 9, ECF No. 1) and failed to review any of the investigatory materials prepared and presented by his public defender. He argues:

> On Jan. 21, 2009 the day of the trial, the unprepared Sidell relied on who he believed to be the prosecution[']s witness, [b]ut that was not the case. Officer Dueslar [sic] was a preliminary hearing witness and gave testimony that attacked the credibility of the prosecution[']s star witness. In layman terms, prosecution suffered from the testimony given by Officer Dueslar during the preliminary hearing and there was no way the prosecution would ever want a jury to hear Officer Dueslar's testimony. (4 R.T. pg. 308-09[.])
>
> Had Sidell read and reviewed the preliminary hearing transcripts or anyone for that matter would know who Officer Dueslar was, and who the missing preliminary witnesses were. It was ineffective for Sidell to wait till the day of the trial to request for a one day delay to interview a defense preliminary witness for the first time. (4 R.T. pg. 308-309[.]) And still failed to contact his preliminary hearing witness even after the judge confirmed that it was his obligatory duty. (EX:V). I was never contacted again by anyone associated with Mr. Geter's defense Officer Duesler purports [sic].

(Pet. 8, ECF No. 1.)

The preliminary hearing transcript (Lodg. No. 12) memorializes Officer Duesler's testimony

regarding his investigation of an incident unrelated to the October 2007 charged crimes. Contrary to Geter's speculation, it is clear from the record that Mr. Siddell considered calling him to testify, substantiating his familiarity with the public defender's investigation and the preliminary hearing transcript. Geter acknowledges that his public defender had previously completed the essential investigation of his case, including witnesses whose testimony was preserved in the preliminary hearing transcript, and that this evidence was available to all his subsequent attorneys. Geter expresses no dissatisfaction with his public defender's representation, suggesting his defense at trial should have proceeded in the same fashion with the same evidence on the same theories. Appellate counsel actually confirms in the opening brief on direct appeal that additional investigation was unnecessary: "The record shows that appellant's first of five trial counsel, his appointed public defender, did all the work to provide witnesses to attack the credibility of appellant's ex-wife Ruth Adams, the named victim in this matter." (Lodg. No. 4, Opening Brief at 1.) The deficiency alleged on appeal was that trial counsel "did nothing with the investigation trial counsel number one [the public defender] had initiated," attributing to that purportedly deficient performance the fact that the "only [trial] evidence therefore consisted of [Geter's] own testimony and the additional testimony of Adams, called as a defense witness." (Id.)

The record reflects that Officer Duesler and a second police officer Mr. Siddell considered presenting may have been unavailable for the trial. The jury was selected the afternoon of January 21, 2009. (Lodg. No. 1, RT vol. 3.) Case presentation began the following morning, a Thursday, at 9:00 a.m. (Id. RT vol. 4.) The prosecution rested before 4:30 p.m. that day, and the jury was excused for the next three days, with trial set to resume Monday, January 26, 2009. (Id. RT vol. 4 at 307.) The following pertinent exchange occurred among counsel and the court.

> MR. SIDDELL: "I have an understanding with the prosecution that they have a police officer that is subpoenaed, and I asked that he be produced."
> . . .
>
> THE COURT: The jurors have exited. [¶] I don't know who – I just didn't know what discussion counsel had regarding this police officer witness, and I did not want to have you get into a conversation about it. But whatever – you intend to call the police officer witness the people said they are going to make available to you?
>
> MR. SIDDELL: Right, Your Honor. And the people had subpoenaed 11 witnesses, and I think of those 11, I only need one of their witnesses.

1    THE COURT: Okay. Have you communicated to Ms. Grasso who that is yet?

2    MR. SIDDELL: Yes.

3    THE COURT: Who is it, Mr. Siddell?

4    MR. SIDDELL: I believe we said it was Officer Conley.

5    MS. GRASSO: Officer Conley, Your Honor.

6    THE COURT: Okay. And he or she will be here on Monday, right?

7    MS. GRASSO: He is under subpoena, and I have a note to myself to get ahold of him
     and have him here on Monday.
8
9    MR. SIDDELL: There is one other witness that I think the People intended to
     subpoena but are unable to subpoena. And I guess I will have to try to do it, and that
     is an officer – I am not sure if I am pronouncing his name correctly – Dusler [sic]. So
10   I guess all I can do is, over the weekend, try to go down to the police station and give
     him a subpoena and see if I can produce him.
11
     THE COURT: Do you have that officer under subpoena?
12
     MS. GRASSO: No, we don't. And we did it electronically, and he's showing
13   unserved, so that indicates – usually indicates he's –

14   THE WITNESS [sic]: Unserved?

15   MS. GRASSO: Unserved, yeah. He could be on vacation. I don't know. He is just
     not served.
16
     . . . .
17
     MS. GRASSO: Your Honor, and just for my information, I know the officers that we
18   are going to have, conditionally, other than that, I have not gotten any other witness
     list.
19
     MR. SIDDELL: No, I expect it will probably be . . . . [¶] Officer Conley and the
20   defendant. I am going to try to get Dusler. But having to do with giving notice, you
     know, if they are on the People's witness list, I think they have notice that they are
21   potential witnesses.

22   THE COURT: Well, I mean, just because they are on the People's witness list doesn't
     mean that the officers in question, they don't, as I understand it, know that they are
23   supposed to be here unless and until they get a subpoena.

24   MR. SIDDELL: Sure. So if I bring Dusler, it's my obligation to subpoena him?

25   THE COURT: Right. Okay.

26   (Lodg. No. 1, RT vol. 4 at 307-310.)

27       The court of appeal on direct review reasonably rejected Geter's claim that defense counsel's

28   failure to call the preliminary hearing witnesses amounted to IAC, finding their testimony would not

likely have resulted in a better trial result for Geter. (Lodg. No. 7, slip op.) Officer Duesler's testimony was tangential, as he had no personal knowledge of the charged crimes. Similarly, bartender Lewis's testimony would have had no bearing on what happened at the gate where the October 26th crime occurred while Adams was trying to leave. Whether Adams sat in the relative safety of her car for several minutes after getting away from Geter rather than driving directly away is not a fact, if believed, that would have substantially affected the verdict. The California Supreme Court summarily rejected Geter's renewed claim on petition for review that "the failure to present the Lewis and police officer Erik Duesler testimony at trial, as previous trial counsel had done at the preliminary hearing" was prejudicial IAC. (Lodg. No. 8 at 5). (Lodg. No. 9).

"In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 690-91. Mr. Siddell had manifestly reviewed the preliminary hearing transcript, among other things, and had investigated and familiarized himself with facts he used to impeach Adams. None of the evidence or witnesses Geter insists Mr. Siddell should have presented at trial had any exculpatory value with respect to the charged crimes. Defense counsel's strategy to rely on Adams' weaknesses as a credible witness and on Geter's own testimony directly contradicting her version of events does not in itself rise to the level of constitutionally deficient performance. The jury heard their incompatible versions of what happened in connection with the charged domestic violence and alleged residential burglary crimes.[6] Credibility issues are the exclusive province of the factfinder. *See* Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004) ("A jury's credibility determinations are . . . entitled to near-total deference"), *citing* Jackson, 443 U.S. at 319.

The transcript of the post-trial Marsden motion belies Geter's sweeping indictment of Mr. Siddell's purported failure to perform any investigation in preparation for trial. (*See* Lodg. No. 3, RT vol. 1A.) As noted by the state courts, the evidence against Geter was "strong" and trial counsel was vigorous in his cross-examination of the only percipient witness, the victim herself. (Pet. Exh. CC,

---

[6] Adams' testimony appears at Lodgment No. 1, RT vol. 4 at 151-224 and Lodgment No. 1, RT vol. 5 at 345-356. Geter's testimony appears at Lodgment No. 1, RT vol. 5 at 320-345.

ECF No. 1-1 at 152.)

> Petitioner contends that trial counsel's failure to call the witnesses that were presented at the preliminary examination to impeach the victim's credibility prejudiced the Petitioner, as he was not able to present an affirmative defense. Petitioner has not shown that these witnesses would have provided him with an affirmative defense. None of the witnesses testified that they actually observed the conduct that was the basis for the criminal charges. Therefore, these witnesses would not have provided Petitioner with an affirmative defense to the charges.

(Pet. Exh. CC, ECF No. 1-1 at 151-152.)

The reporter's transcript permits an assessment of the defense Mr. Siddell mounted, and the reasonableness of the state courts' determinations Geter received constitutionally adequate representation. *See* Premo, 131 S.Ct. at 745 ("A trial provides the full written record and factual background that serve to limit and clarify some of the choices counsel made"). The defense case in chief consisted of Geter's own testimony and a recall of Adams as a defense witness. Consistently with the consensus of all his attorneys as well as the state courts, the case rested principally on the believability of the percipient witnesses to the charged crimes, Adams and Geter. As stated by the court of appeal: "The trial court observed, and the record reflects, that defense counsel vigorously attacked Adams's credibility," and the "entire theme of the defense was that Adams was not credible." (Lodg. No. 7, slip op. at 7.) Trial counsel are accorded broad latitude in the assessment and conduct of a case. Cullen, 131 S.Ct. at 1400-01; Strickland, 466 U.S. at 689. It would not have been unreasonable for Mr. Siddell to have exercised his professional judgment to conclude that the victim's own testimony sufficiently undermined her credibility to create reasonable doubt, rendering additional impeachment witnesses expendable.

The state habeas courts noted that Geter had unsuccessfully raised his claim of defense counsel IAC in a new trial motion and again as the basis for his appeal. "Both courts found that, assuming arguendo that Mr. Siddell had made a mistake in the manner in which he handled the defense, Petitioner was still not entitled to relief, as there was no reasonable probability that a more favorable result would have been obtained by Petitioner." (Pet. Exh. CC, ECF No. 1-1 at 151.) As described in the evidentiary hearing discussion above (*see* Section II.B.), the state courts on collateral review considered the evidence Geter provided in support of his habeas petitions as insufficient to alter the denial of relief. (*See* Pet. Exh. CC, ECF No. 1-1 at 151 ("There are not sufficient facts to show that

28

counsel's performance rendered the result of the proceeding unreliable or fundamentally unfair"); *see also* (Pet. Exh. DD, ECF No. 1-1 at 164-165 ("The declarations do not make out a prima facie showing counsel was deficient and that Geter was prejudiced as a result").) As the superior court stated:

> Petitioner contends he was provided ineffective assistance of counsel in that counsel failed to present witnesses or subpoena records that would have established the victim's version of events was fabricated and that Petitioner is actually innocent. In addition, counsel failed to obtain the file from the defense investigator, who had passed away, and failed to hire a new investigator after ancillary fees had been awarded by the court. . . . .
>
> [E]ven though there may have been additional testimony that could have impeached the victim's credibility, defense counsel [Mr. Siddell] did effectively impeach the victim's credibility at trial through his cross-examination. Further, Petitioner's claims of what a further investigation may have established are speculative.

(Pet. Exh. CC, ECF No. 1-1 at 150, 152.

Despite the uncertainty expressed by the state courts as to why Mr. Siddell did not call the two impeachment witnesses who testified at the preliminary hearing, it was not unreasonable for the state courts to conclude on this record that no prejudice ensued from their absence at trial. "*Strickland* does not guarantee perfect representation, only a ' "reasonably competent attorney." ' [Strickland,] 466 U.S. at 687 (quoting *McMann v. Richardson*, 397 U.S. 759, 770 (1970)." Richter, 131 S.Ct. at 791 (parallel citations omitted). The United States Supreme Court "has never required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success," Knowles v. Mirzayance, 556 U.S. 111, 123 (2009), let alone evidence with no exonerating content. "The question on federal habeas review of an IAC claim is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard," not "whether counsel's actions were unreasonable." Richter, 131 S.Ct. at 788. The Court recommends a finding that there is such a reasonable argument in this case. Geter accordingly has not satisfied either AEDPA exception to the deference federal habeas courts owe the reasonable determinations of state courts on the merits of federal claims. Accordingly, the undersigned recommends relief on Ground Two be **DENIED**.

### 6. Ground Three: Attorney Cohen's Representation

Attorney Daniel Cohen was appointed to replace Mr. Siddell following the March 2009 post-trial Marsden hearing. (Lodg. No. 2, CT at 206-207.) Geter claims his performance was deficient because he purportedly raised only "disparate issues" at the June 12, 2009 new trial motion hearing

(Pet. 11, ECF No. 1; *see* Lodg. No. 1, RT vol. 7), and he was insufficiently zealous at the sentencing hearing.

> As Cohen was underprepared, missing key issues and failing to connect the nexus between R. Geter's history of fabricating incidents and injuries to her escalation to self-mutilation Munchausen's Sydrome at the June 12, 2009 new trial motion hearing, he was equally ineffective at the June 19, 2009 sentencing. (8 R.T. pp. 458-471).

(Pet. 99, ECF No. 1.)

Geter's arguments suggest he believes counsel should have used the new trial motion to retry the case with additional evidence. He vaguely asserts that trial deficiencies cast "grave doubt as to whether or not the incidents of Oct. 26-31, 2007 actually occurred, were staged, and as part of R. Geter's mental issues, drinking issues, etc." (Pet. 99, ECF No. 1.) However, he does not challenge as a ground for relief the sufficiency of the evidence to support his conviction, and there appears to be no basis to do so. Geter also argues Mr. Cohen should have compelled Mr. Siddell to appear at the motion hearing to explain his defense strategy:

> The issue was not what the missing preliminary witnesses['] testimony would have been. The hearing was subsequent to the [M]arsden [hearing] where the court allowed petitioner to fire Sidell due to his representation. Failing to produce Sidell to explain tactical reasoning not to call witnesses and ultimately answer to [sic] the questions he avoided in Mr. Zimmerman['s] letter. See (Exhibit: Y) Appellate Attorney, Mr. Zimmerman['s] Declaration. . . . [¶] . . . Daniel Cohen does not mention anything remotely . . . close to rele[v]ant questions. Had Cohen subpoena[ed] Sidell, then we need not speculate to what Sidell's tactics were for a legal defense. The relevant questions are in Mr. Zimmerman's letter to Sidell.

(Pet. 11, ECF No. 1.)

Federal habeas courts must evaluate counsel's performance objectively. <u>Richter</u>, 131 S. Ct. at 790. Even if Mr. Cohen had subpoenaed Mr. Siddell to testify at the new trial motion hearing to explain his subjective intent and strategic decisions at trial, his explanations would not be dispositive of the analysis. Further, even if Mr. Siddell acquiesced that his decision not to call impeachment witnesses, for example, was deficient to the point of falling below an objective standard of reasonableness, Geter would still have had to show that any such error prejudiced the outcome of his trial. (*See* Ground Two discussion, above.) Moreover, in consideration of the explanations Mr. Siddell placed on the record at the earlier <u>Marsden</u> hearing (*see* footnote 4, above), there is no reasonable probability that Geter would have been granted a new trial if only Mr. Cohen had

30

compelled him to repeat those explanations. At a minimum, there is a "reasonable argument that counsel satisfied *Strickland*'s deferential standard," <u>Richter</u>, 131 S.Ct. at 788, in his representation at the new trial motion hearing. Even if Mr. Cohen made unprofessional errors in his post-trial representation, the undersigned recommends the Court find that there is no "reasonable probability that, but for counsel's unprofessional errors," Geter would have received a better result at the post-trial proceedings (<u>Strickland</u>, 466 U.S. at 694), as each reviewing state court to reach the issue implicitly found.

The court presiding at Geter's June 19, 2009 sentencing had also been his trial judge. On the issue of alleged IAC at the sentencing hearing, Geter argues: "Cohen failed to be an '<u>active</u> adversarial advocate' at sentencing." (Pet. 100, ECF No. 1; *see also* Pet 11.)

> It comes down to Cohen "overlooking the obvious." There were clear factors in mitigation:
>
> (a) Relating to the conflicting evidence, lack of physical evidence, history of R. Geter's incidence/injury hoaxes, history of her drunkenness and self-mutilation, history of her calling and baiting petitioner.
>
> (b) Relating to the crimes convicted of (Cal. Rules Ct. Rule 4.423(a)(2)-(4).[7]

(Pet. 100, ECF No. 1.)

Geter cites no authority for the proposition that a court may permissibly consider evidentiary attacks on the verdict as purportedly mitigating factors for sentencing purposes. The weighing of trial evidence and assessment of witness credibility are functions entrusted solely to the factfinder in reaching its verdict. Sentencing courts do not revisit the viability of the verdict itself. Mr. Cohen cannot be found to have rendered constitutionally deficient representation for failing to pursue futile or inappropriate arguments in an attempt to secure a lesser sentence.

At the time of sentencing, Mr. Cohen informed the court that he had decided not to file a statement in mitigation, explaining that he "did not have any new letters," and "the court assured me it read all of the letters" already submitted. (Lodg. No. 1, RT vol. 8 at 458.) Mr. Cohen also stated he wanted "to incorporate and reassert Mr. Siddell's Romero motion" asking that the strike prior be

---

[7] Cal. Rules of Court, Rule 4.423, "Circumstances in Mitigation," Rule 4.423(a), "Factors relating to the crime," provides in pertinent part: "(2) The victim was an initiator of, willing participant in, or aggressor or provoker of the incident; (3) The crime was committed because of an unusual circumstance, such as great provocation, that is unlikely to recur." Those factors do not appear to apply in Geter's case.

stricken.  (<u>Id.</u> at 458-459.)  The court identified the various documents it had received and considered prior to hearing argument of counsel and prior to imposing sentence:  the 12-page probation report in the case; the <u>Romero</u> motion; the People's sentencing memorandum "requesting that the court follow the probation recommendation of 19 years, but asking that the court give him no less than 15 years." (<u>Id.</u> at 458-459.)  In addition, the court stated:

> I have received, over the past three days, two mailings from Mr. Geter.  They include handwritten letters asking for leniency, which I have read.  They also include the transcript from, I believe, the trial, as well as a portion of the police reports.
>
> And it became clear to the court, after reading the letters and the first few paragraphs of the transcript, that it was Mr. Geter's desire that the court review the transcript in hopes of finding that the victim was not telling the truth, and therefore, casting doubt on her testimony, and on the verdict, in the hopes of receiving leniency.
>
> And when I realized that was the purpose of the transcript, I declined to take the time to read these several pages of transcript that Mr. Geter included in his letters.  He also included, for some reason, I am not sure what, a picture of a dog, and two separate mailings with two separate letters.  I have read the letters, I have not reviewed the transcripts, in detail, or the police report for the reasons I have stated.

(Lodg. No. 1, RT vol. 8 at 459-460 (stating that the court had also read "the numerous letters, word for word, prior to the last hearing, prior to the Marsden motion being granted and new counsel being appointed".)

In arguing for a reduced sentence, Mr. Cohen noted that the victim's injuries were less serious than in other felony cases, with no broken bones, physical scarring, or permanent injury. He emphasized that the relationship between Geter and Adams was "volatile and contemptuous," but it "has no prospect of continuing," since Adams had since moved away and did not want to continue a relationship with Geter.  He observed that Geter "has strong community support," was employed, and had prospects.  Mr. Cohen also urged the court to dismiss the prior strike and "to give no more than the mitigated sentence, and not the aggravated or mid-term" sentence. (Lodg. No. 1, RT vol. 8 at 460-461.)  The People countered those arguments by urging the court to look at Geter's considerable criminal history, highlighting his several convictions for theft, corporal injuries to a spouse, robbery, battery, parole and probation violations, narcotics possession, beating Adams up in 1996 causing her to spend time in the hospital, and prior prison time.  (<u>Id.</u> at 461-462.)

The court also allowed Geter to speak on his own behalf before pronouncing sentence.  He

denied his guilt of both the crimes, emphasized his good works, inferred that Adams simply wanted him returned to prison because she wanted to hurt him, and asked for leniency. (Lodg. No. 1, RT vol. 8 at 463-464.)

Despite Mr. Cohen's attempt to focus the court's attention on the future in arguing for a reduced sentence, the court confessed to "being floored" while examining the probation report, finding it reflected "an entire life of criminal activity throughout his adult life. . . . 20 years worth." (Lodg. No. 1, RT vol. 8 at 465.) The court characterized Geter as manifesting "hubris" to "unabashedly and without any sense of hesitation, when confronted with the prior felony domestic violence case with the same victim from years ago, for which he went to prison," deny that it happened, contending it "did not happen, and it was all a bunch of lies." (Id. at 465-466.) The court observed Geter adopted the same stance in this case by pretending, "It just did not happen. A bunch of lies." (Id.) The court declined to strike the strike prior and imposed a total prison term of 13 years, less than the maximum exposure Geter faced. Nothing Mr. Cohen could have done differently is reasonably likely to have affected the court's assessments in the exercise of its sentencing discretion.

From this record, it would be unreasonable to conclude that Geter received IAC from Mr. Cohen at sentencing, or that he would have been granted a new trial if only Mr. Cohen "fully present[ed]" all the detail of Geter's complaints about Mr. Siddell's representation. Geter identifies no authority for the proposition that a failure to pursue unmeritorious arguments impugning the representation of prior counsel can support an IAC claim against subsequent counsel. Accordingly, the undersigned recommends relief on Ground Three be **DENIED**.

## 7. Ground Four: Trial Court's Abuse Of Discretion

Geter alleges as Ground Four that the trial court abused its discretion "to grant only a one-day delay" when "Siddell came on the case . . . the day of trial. . . ." (Pet 101, ECF No. 1.) Although Geter's representation that Mr. Siddell formally appeared as counsel of record for the first time the day his trial was scheduled to begin may be technically accurate (Pet. 12, ECF No. 1), he concedes Mr. Siddell actually became associated with the defense at least three weeks earlier. (Pet. 8, ECF No. 1; *see also* Lodg. No. 3, RT vol. 1A.) The duration and nature of his association with Geter's case is discussed in connection with Ground Two, above. Geter complains that "Mr. Siddell said he was

prepared" the day before trial, whereas Geter believed that they had yet to obtain "evidence and the witnesses and subpoenas . . . vital to this case." (Lodg. No. 3, RT vol. 1A at 7-8.)

Trial courts have broad discretion "on matters of continuances." Morris v. Slappy, 461 U.S. 1, 11 (1983) ("Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise prepare for trial violates a defendant's Sixth Amendment right to counsel"). The denial of a continuance can violate due process if it was arbitrary in the circumstances of the given case, in light of "particularly . . . the reasons presented to the trial judge at the time the request [was] denied." Ungar v. Sarafite, 376 U.S. 575, 589 (1964). In this case, no continuance request was denied, as it does not appear that Mr. Siddell sought more time than the one day the court accorded. At the post-trial Marsden hearing, Mr. Siddell described the circumstances of the continuance:

> MR. SIDDELL: It was simply a verbal motion. I advised Judge Deddeh that I was prepared to go to trial, but the only concern was that we didn't have AT&T phone records. And as I say, I attempted to obtain the records. They didn't come until the day after trial and when they did come, they had no evidentiary value.

(Lodg. No. 3, RT vol. 1A at 14.)

"In the face of the unequivocal and uncontradicted statement by a responsible officer of the court that he was fully prepared and 'ready' for trial, it was far from an abuse of discretion to deny a continuance." Morris, 461 U.S. at 12. The trial court in this case had no reason to sua sponte continue the trial for some additional and arbitrary period when defense counsel declared himself ready to proceed. Geter identifies no United States Supreme Court authority to which the state court result rejecting relief on this theory is contrary. The undersigned accordingly recommends relief on Ground Four be **DENIED**.

### 8.    **Ground Five:  IAC Of Appellate Counsel**

Geter alleges his appointed appellate counsel, Harry Zimmerman, provided constitutionally ineffective representation because he "should have based the argumen[t] in the State Court of Appeal upon that articulated later before the State of California Supreme Court." (Pet 13, ECF No. 1.)  He argues that had appellate counsel not been "precluded from raising arguments which were effectively forfeited by failing to raise and properly articulate [them] before the lower court" under state rules of court, he would have received "a more beneficial outcome . . . on direct appellate review."  (Id.)

Those contentions suggest Geter intends to argue that some deficiency in Mr. Zimmerman's representation resulted in a procedural default or some other state-law impediment to having his federal claims adjudicated by the state's highest court. However, he fails to identify with specificity where that purportedly prejudicial error appears. Geter merely invites the Court to "compare the argument caption" in the opening brief to the court of appeal with the caption in the petition for review to the state supreme court. (Pet. 102, ECF No. 1.) The Court notes the "captions" of Lodgment No. 4 and Lodgment No. 8 similarly assert deficient performance of trial counsel. Respondent does not raise any impediment such as procedural default that bars this Court from reaching the merits of Geter's IAC claims. Rather, Respondent contends "appellate counsel presented the same claim on direct appeal that he presented in a petition for review," defeating any actionable claim based on an inference that some meritorious post-conviction claim was lost due to appellate counsel's deficient performance in pursuing relief on direct review. (Ans. 18-19, ECF No. 10-1.)

However, liberally construing this pro se petitioner's pleading, Geter may be attempting to argue that his appellate attorney challenged only his defense counsel's trial representation without raising on direct review "all of the arguments above herein," referring presumably to his Petition claims, which are the same as he presented pro se in a habeas petition to the California Supreme Court. He argues a litany of deficiencies in the representation by his several pre-trial, trial, and post-trial attorneys that appellate counsel did not raise on direct review. Relying on his own opinions about how the trial ought to have been conducted, he contends in conclusory fashion "it is clear appellate counsel's performance 'fell below an objective standard of reasonableness' (Strickland, 466 U.S. at 687-88) to which petitioner was prejudiced to the point where had appellate counsel's acts and omissions not occurred a more beneficial outcome to petitioner would have accrued on direct appellate review." (Pet. 102-103, ECF No. 1.) However, "failure to raise issues on direct appeal does not constitute ineffective assistance when appeal would not have provided grounds for reversal." Wildman v. Johnson, 261 F.3d 832, 840 (9th Cir. 2001). As discussed above, this Court concludes no constitutional error occurred on any of the grounds Geter raises that prejudiced the outcome of the state court proceedings.

The Sixth Amendment standard applicable to counsel's representation is the same "before,

during, or after trial," and that is "reasonable competence representing the accused." Premo, 131 S.Ct. at 745 ("In applying and defining this standard substantial deference must be accorded to counsel's judgment"), *quoting* Strickland, 466 U.S. at 689. "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 131 S.Ct. at 786-87. Applying the "double deference" federal habeas courts owe to state court determinations on IAC claims, the Court should find that the state courts reasonably determined Geter received adequate representation from his succession of attorneys in this matter, including his appellate attorney, and that there is no reasonable probability the outcome of Geter's trial or post-trial proceedings would have been more favorable to him if only his several attorneys had performed in the manner he contends they ought to have performed. Accordingly, the undersigned recommends the Court **DENY** relief on Ground Five.

**D. No Cumulative Error**

Although he does not present "cumulative error" as a separate ground for habeas relief, Geter asks that the Court "take judicial notice of the cumulative omissions of 'both' counsels." (Traverse 2, ECF No. 12.) Even if the Court could reach this claim, it is without merit.

The Ninth Circuit recognizes the possibility that the combined effect of discrete trial errors, including errors of state law only, when none of them individually warrants relief, can be found to have had a substantial and injurious effect on the jury's verdict. Nevertheless, "[a] habeas court may not grant the writ on the basis of errors of state law whose combined effect does not violate the Federal Constitution. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Pulley v. Harris*, 465 U.S. 37, 41 (1984)." Parle v. Runnels, 387 F.3d 1030, 1045-46 (9th Cir. 2004) (parallel citations omitted) (vacating the district court's order granting a writ on a Confrontation Clause challenge, but remanding for reevaluation of "the cumulative prejudicial effect of the errors independent from the Confrontation Clause issue," instructing that: "On remand, the district court may consider and aggregate any errors of federal and state law in connection with its cumulative error analysis, but only to the extent that the errors relate to the issue of whether petitioner was denied a fair trial").

36

The Supreme Court has clearly established that the combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair. *Chambers*, 410 U.S. at 298, 302-03 (combined effect of individual errors "denied [Chambers] a trial in accord with traditional and fundamental standards of due process" and "deprived Chambers of a fair trial"). The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal. *Chambers*, 410 U.S. at 290 n. 3.

Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (footnotes and parallel citations omitted); *see* Phillips v. Woodford, 267 F.3d 966, 985-86 (9th Cir. 2001) ("We consider the cumulative prejudicial effect of multiple trial errors in determining whether relief is warranted"), *citing* Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir.1992) (per curiam); *see also* Alcala v. Woodford, 334 F.3d 862, 882-83 (9th Cir. 2003) (holding "that the district court did not err in finding that the combined prejudice of the multiple errors committed in this case deprived [petitioner] of a fundamentally fair trial and constitutes a separate and independent basis for granting his petition").

There is no constitutional right to a "perfect trial," only a fair one. Brown v. United States, 411 U.S. 223, 231-32 (1973). Geter's contention that cumulative error warrants habeas relief in his case presupposes that the Court would find substantial error occurred in connection with at least two of his claims. Here, all his cognizable claims arise from alleged IAC of each attorney who represented him after his public defender was relieved. He has not established that two or more substantial errors occurred in his legal representation which, considered in combination, could overcome their failures individually to satisfy the substantial and injurious effect standard of Brecht, 507 U.S. at 623. *See* Hayes v. Ayers, 632 F.3d 500, 523-24 (9th Cir. 2011) ("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible").

For all the foregoing reasons, the undersigned recommends that the Court find that the state court decisions on each of Geter's claims conform to controlling United States Supreme Court authority and that the state courts made objectively reasonable factual determinations from the record in reaching their results. *See* 28 U.S.C. § 2254(d). Thus, neither AEDPA exception to the deference federal habeas courts owe to state court results is satisfied here, and federal habeas relief is foreclosed. As Geter is not in custody in violation of federal law, the Court should **__DENY__** the Petition. 28 U.S.C. § 2254(a).

1  \\

2  \\

3  **III.    CONCLUSION AND RECOMMENDATION**

4      The Court submits this Report and Recommendation to United States District Judge Dana M.

5  Sabraw under 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court

6  for the Southern District of California.  For all the foregoing reasons, **IT IS RECOMMENDED** this

7  habeas Petition be **<u>DENIED</u>** in its entirety as the petitioner is not in custody in violation of any federal

8  right.  **IT IS FURTHER RECOMMENDED** the Court issue an Order (1) approving and adopting

9  this Report and Recommendation and (2) directing that judgment be entered denying the Petition.

10      **IT IS HEREBY ORDERED** that no later than **<u>August 16, 2013</u>**, any party to this action may

11  file written objections with the Court and serve a copy on all parties.  The document should be

12  captioned "Objections to Report and Recommendation."  **IT IS FURTHER ORDERED** that any

13  Reply to the Objections shall be filed with the Court and served on all parties no later than **<u>August 26,</u>**

14  **<u>2013</u>**.  The parties are advised that failure to file objections within the specified time may waive the

15  right to raise those objections on appeal of the Court's Order.  *See* <u>Turner v. Duncan</u>, 158 F.3d 449,

16  455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d 1153, 1157 (9th Cir. 1991).

17

18  DATED:  July 30, 2013

19

20                                                          Jan M. Adler
                                                            U.S. Magistrate Judge

21

22

23

24

25

26

27

28

38